David E. Bower (SBN 119546)
**MONTEVERDE & ASSOCIATES PC**
600 Corporate Pointe, Suite 1170
Culver City, CA 90230
Tel: (213) 446-6652
Fax: (212) 202-7880
dbower@monteverdelaw.com
*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH BOUDRE, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> RESONANT INC., GEORGE B. HOLMES, and MARTIN S. MCDERMUT, <br><br> Defendants. | Case No. <br><br> **CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 14(e) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** <br><br> JURY TRIAL DEMANDED |

Plaintiff, Joseph Boudre ("Plaintiff"), on behalf of himself and all others similarly situated, by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE CASE

1. This is a stockholder class action by Plaintiff against Resonant Inc. ("Resonant" or the "Company"), Resonant's Chief Executive Officer, George B. Holmes, and Resonant's Chief Financial Officer, Martin S. McDermut (collectively

CLASS ACTION COMPLAINT

referred to as the "Individual Defendants" and, together with Resonant, the "Defendants") for their violations of Sections 14(e) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").  Plaintiff's claims arise in connection with the tender offer by PJ Cosmos Acquisition Company, Inc. ("Purchaser"), a wholly-owned subsidiary of Murata Electronics North America, Inc. ("Murata"), to purchase all outstanding shares of Resonant ("Tender Offer").  Murata is a subsidiary of Murata Manufacturing Co., Ltd. ("MMC").

2.     In 2019, Murata acquired an ownership stake in Resonant, and MMC executed a Collaboration Agreement[1] with Resonant that, among other things, provided MMC with the exclusive right to the Company's XBAR® technology for filters or resonators for use in mobile communication devices until March 31, 2022 (discussed further herein).

3.     On February 14, 2022, the Company entered into an Agreement and Plan of Merger with Murata and Purchaser ("Merger Agreement"), whereby Purchaser was to acquire all outstanding shares of the Company's common stock for $4.50 in cash per share ("Offer Price").  When the Merger Agreement was executed, Murata owned 4.1% of Resonant's outstanding shares.

4.     On February 28, 2022, Defendants violated the above-referenced Sections of the Exchange Act by authorizing the filing of a materially false and misleading Schedule 14D-9 Solicitation/Recommendation Statement ("Recommendation Statement") with the SEC.[2]

5.     The Recommendation Statement provided a materially false and misleading valuation picture for Resonant, by disclosing two unreasonably low sets of financial projections (*i.e.*, Case One and Case Two Projections) that did not reflect

---

[1] All capitalized terms not defined herein have the same meanings as set forth in the Recommendation Statement (defined below).
[2] Resonant Inc. Solicitation/Recommendation Statement (Schedule 14D-9) (February 28, 2022), tm227702-2_sc14d9 - none - 9.9219404s (sec.gov).

CLASS ACTION COMPLAINT

management's true belief in the value and prospects of the Company. Both sets of projections were then utilized by Resonant's financial advisor, Centerview Partners LLC ("Centerview") in rendering the fairness opinion in connection with the Tender Offer.

6.    On December 15, 2021, management presented to the Company's board of directors ("Board") the Case One Projections (*i.e.*, base case) and the Case Two Projections (*i.e.*, upside case) (together, the "Fairness Projections"). The Case One Projections were based upon the assumption that Murata remained the Company's only significant technology development and licensing partner. The Case Two Projections assumed that following expiration of exclusivity with MMC, the Company would also have <u>multiple</u> other technology development and licensing partners in addition to Murata. However, the Case One Projections, and even worse the upside Case Two Projections, were significantly lower than what management truly believed the financial prospects of Resonant to be. Throughout the entire year leading up to presentation of the Fairness Projections, Defendant Holmes, with Defendant McDermut always in attendance, publicly touted that Resonant's partnership with Murata <u>alone</u> would likely generate *over* **$100 million** in annual revenue for the Company. Yet, the Fairness Projections do not even come close to forecasting this $100 million annual revenue figure.

7.    Despite genuinely believing that the Company's value and financial prospects exceeded the numbers reflected in the Fairness Projections, Defendants created the unreasonably low Fairness Projections to justify the inadequate Offer Price from Defendant Holmes' favorite shareholder and partner, Murata. In selling Resonant, Defendants Holmes and McDermut chose to abandon the Company's stand-alone plan at the heels of expiration of exclusivity with MMC, despite the fact that Resonant was set to experience significant growth, in order to receive golden parachute compensation and obtain employment with their preferred merger partner, Murata.

- 3 -

CLASS ACTION COMPLAINT

8.     The Tender Offer expired at one minute following 11:59 p.m., New York City time, on March 25, 2022 ("Expiration Time"), and Resonant shareholders were cashed out of their shares at the inadequate Offer Price. On March 28, 2022, the Tender Offer was completed pursuant to the terms of the Merger Agreement.  Purchaser merged with and into Resonant, with the Company continuing as the surviving corporation and a wholly owned subsidiary of Murata.

9.     For these reasons and as set forth in detail herein, Plaintiff and the Class (defined herein) seek to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under Sections 14(e) and 20(a) of the Exchange Act, 15 U.S.C. §78n.  The Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

11.     This Court has personal jurisdiction over all of the Defendants because each is either a corporation that conducts business in and maintains operations in this District, or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. Moreover, "[w]here a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the [Exchange] Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

12.     Venue is proper in the Central District of California under Section 27 of the Exchange Act, 15 U.S.C. §78aa, as well as pursuant to 28 U.S.C. §1391, because:

CLASS ACTION COMPLAINT

(i) Resonant maintains a significant business presence in this District, including facilities, offices, and laboratory space; (ii) each Defendant transacted business in this District; and (iii) a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Moreover, up until October 2020, Resonant maintained its principal executive offices in this District.

## **PARTIES**

13.     Plaintiff was, at all relevant times, a shareholder of Resonant.

14.     Defendant Resonant Inc. (previously defined as "Resonant" or the "Company") is incorporated under the laws of Delaware with principal executive offices located at 10900 Stonelake Blvd., Austin, TX 78759.  The Company maintains facilities in Goleta and Burlingame, California where the majority of its engineering employees work. Resonant is a late-stage development company that designs and develops filters for radio frequency (RF) and front-ends used in the mobile device, automotive, medical, internet-of-things, and related industries in Japan, China, and internationally. Resonant uses Infinite Synthesized Networks technology, a software platform to configure and connect resonators that are building blocks of RF filters. The Company develops a series of single-band designs for frequency bands; and multiplexer filter designs for two or more bands to address the carrier aggregation requirements; and XBAR, a technology for mobile and non-mobile applications, including 5G, WiFi, and Ultra-WideBand applications. The Company's common stock traded on the Nasdaq under the ticker symbol "RESN."

15.     Individual Defendant George B. Holmes was, at all relevant times, a director of the Company, Chairman of the Board, President, and Chief Executive Officer. Defendant Holmes was part of the Special Committee and the Strategic Advisory Committee formed by the Board in connection with the sales process. Holmes was authorized to receive notices and communications on behalf of Resonant, which was identified as the "person" filing the Recommendation Statement.

CLASS ACTION COMPLAINT

16.     Individual Defendant Martin S. McDermut was, at all relevant times, the Chief Financial Officer of the Company. Defendant McDermut signed the Recommendation Statement in his capacity as Chief Financial Officer and certified that the information set forth therein was true, complete and correct.

17.     The Individual Defendants identified in paragraphs 15 and 16 are collectively referred to herein as the "Individual Defendants," and together with Resonant, the "Defendants."

### **RELEVANT NON-PARTIES**

18.     Michael J. Fox was, at all relevant times, a director of the Company. Fox was part of the Special Committee and the Strategic Advisory Committee formed by the Board in connection with the sales process.

19.     Rubén Caballero was, at all relevant times, a director of the Company.

20.     Alan B. Howe was, at all relevant times, a director of the Company. Howe was part of the Special Committee and the Strategic Advisory Committee formed by the Board in connection with the sales process.

21.     Jack H. Jacobs was, at all relevant times, a director of the Company.

22.     Joshua Jacobs was, at all relevant times, a director of the Company.

23.     Jean F. Rankin was, at all relevant times, a director of the Company. Rankin was part of the Special Committee and the Strategic Advisory Committee formed by the Board in connection with the sales process.

24.     Robert Tirva was, at all relevant times, a director of the Company. Tirva was part of the Special Committee and the Strategic Advisory Committee formed by the Board in connection with the sales process.

25.     Defendant Holmes and the individuals identified in paragraphs 18 through 24 collectively comprised the Company's Board at all relevant times.

26.     Murata Electronics North America, Inc. (previously defined as "Murata") manufactures electrical components. Murata offers capacitors, noise suppression,

- 6 -

CLASS ACTION COMPLAINT

filters, inducftors, resistors, wireless connectivity platforms, timing, sensors, thermistors, and power devices. Murata serves customers worldwide.

27.     Murata Manufacturing Co., Ltd. (previously defined as "MMC") is Murata's parent and designs, manufactures, and sells electronic components and related products in Japan and internationally. MMC operates through Components, Modules, and Others segments. It offers capacitors, inductors, noise suppression products/EMI suppression filters/ESD protection devices, resistors, thermistors, sensors, timing devices, quartz devices, sound components, power products, batteries, micro mechatronics, RFID devices, matching devices, baluns, couplers, filters, phase shifters, RF switches, front-end modules, SAW components, connectors, antennas, connectivity modules, wireless connectivity platforms, ionizers/active oxygen modules, and digital panel meters. MMC provides its products for use in medical and healthcare equipment, mobile communications, industrial equipment, white goods, business machines, personal computers, and AV equipment, as well as smart home, automotive, network, data center, lighting, security and safety, and AI speaker and hearable applications.

## SUBSTANTIVE ALLEGATIONS

### A.     Relationship Between Resonant, MMC, and Murata

28.     In the first half of 2019, at the heels of Resonant's invention of the XBAR® filter technology, Resonant sought a development partner to assist in the product's commercialization.  As a result, Murata and Resonant executed a Purchase Agreement, and Murata's parent, MMC entered into a Collaboration Agreement with Resonant.

29.     On July 31, 2019, Murata and Resonant executed a Purchase Agreement by which Murata acquired 8.5% of the Company's outstanding shares. Immediately prior to execution of the Merger Agreement, Murata owned 4.1% of Resonant's outstanding shares.

CLASS ACTION COMPLAINT

30.    On September 30, 2019, MMC and Resonant entered into the Collaboration Agreement on the development of proprietary circuit designs using Resonant's XBAR® technology, and Resonant licensed rights for products in four specific radio frequency bands to MMC.  For rights to the design, MMC agreed to pay Resonant up to $9.0 million in pre-paid royalties and other fees, of which $4.5 million has been paid (as of filing of the Recommendation Statement). Pursuant to the Collaboration Agreement, MMC had the *exclusive right* to Resonant's XBAR® technology for filters or resonators for use in mobile communication devices, which expired on *March 31, 2022*.  Suspiciously, the Merger Agreement was executed right before expiration of MMC's exclusive right to the XBAR® technology.

31.    Two years later, on September 30, 2021, MMC and Resonant expanded their Collaboration Agreement through an Addendum that provided for the development of XBAR®-based proprietary circuit designs for up to four underline additional radio frequency bands (*i.e.*, eight total bands).  For rights to designs in these four additional bands, MMC agreed to pay Resonant a minimum of $4.0 million and up to an aggregate of between $8.0 million and $36.0 million in pre-paid royalties and other fees, with the amount of the aggregate payments determined based on the complexity of the designs selected by MMC for development.

**B.    Background of the Process Leading Up to the Tender Offer**

32.    On September 20, 2021, *just days* before MMC and Resonant executed the Addendum to the Collaboration Agreement, two MMC representatives, Hiroyuki Niwa, Senior Manager of Corporate Strategy Section of MMC, and Takaki Murata, Director of RF Device Division of MMC, had discussions with Defendant Holmes regarding Murata's interest in acquiring Resonant.

33.    On October 12, 2021, days after a follow-up call between Defendant Holmes and Mr. Niwa, Murata submitted an all-cash proposal to acquire Resonant at

CLASS ACTION COMPLAINT

$4.00 per share, subject to a period of exclusivity for due diligence and other negotiations.

34.     The *very next day*, the Board met to consider Murata's proposal with management and the Company's legal counsel, Stubbs Alderton & Markiles, LLP ("Stubbs Alderton") present. The Board determined that Murata's proposal undervalued the Company, yet the Board still proceeded to discuss "engaging in a sales process relative to other opportunities available to Resonant, the manner of conducting, and timing of, a sales process, valuation, business risks and other parties that could potentially be interested in acquiring Resonant." The Board even formed a Special Committee that included Defendant Holmes to interview potential financial advisors for a possible sales process.  In other words, the Board, led by Defendant Holmes, was quick to abandon Resonant's stand-alone plan and initiate a sales process the second Murata expressed interest.  Indeed, initiation of the sales process was meant to disguise what Defendant Holmes knew from Murata's initial outreach to him, that he was going to sell the Company to his preferred shareholder and partner, Murata.

35.     On November 5, 2021, the Board met again with Stubbs Alderton present to discuss updates on the search for a financial advisor and management's recent conversations with Murata. During the meeting, Defendant Holmes mentioned that he was having dinner with Mr. Murata to discuss the existing Collaboration Agreement.

36.     At the November 9th meeting, the Board approved Centerview as Resonant's financial advisor in connection with the sales process.[3] Moreover, the Board decided to limit bidder outreach to only strategic parties, for pretextual reasons. The Board, led by Defendant Holmes, really wanted to limit outreach because the Individual Defendants knew they wanted to sell the Company to Murata. The Individual Defendants knew that engaging with solely strategic parties raises a host of complicating factors, given the confidentiality concerns that exist because of the need

---

[3] Centerview was formally retained by the Company on November 15, 2021.

CLASS ACTION COMPLAINT

to share proprietary information with potential competitors. Defendants also knew that Murata had a significant advantage over any other interested strategic parties, given its preexisting relationship with the Company and its in-depth knowledge of the Company's products and business.

37.     From November 2021 through January 2022, the Board directed Centerview to hold discussions with 11 approved parties (including Murata), regarding interest in a transaction with Resonant.  Of the 11 parties, five indicated interest in continuing discussions (*i.e.*, Murata, Company A, Company B, Company C, and Company D).  At different times during this period, Resonant executed non-disclosure agreements ("NDAs") with Murata, Company A, and Company B, and provided them with access to Resonant's virtual data room. Each one of these NDAs contained (or were amended to add) standstill provisions.

38.     On December 6, 2021, the Board met and authorized the engagement of Stifel, Nicolaus & Company, Incorporated ("Stifel") as financial advisor to the sales process in addition to Centerview, and on January 24, 2022, Stifel was formally engaged.  Further, the Board expanded the Special Committee's role to now oversee the sales process, renaming it the Strategic Advisory Committee (which again included Defendant Holmes).

39.     Then, on December 9, 2021, Murata submitted a revised all-cash proposal to acquire the Company for $4.20 per share, and requested exclusivity to negotiate the transaction.

40.     In planning for a sales process, management, led by Individual Defendants McDermut and Holmes, *prepared, for the first time,* the Company's long-range financial projections for 2022-2026 (*i.e.*, the Fairness Projections).

41.     Subsequently, on December 15, 2021, senior management presented the Fairness Projections to the Board and Stubbs Alderton.  And in allowing management to present the downwardly-revised Fairness Projections to the Board, Defendant

CLASS ACTION COMPLAINT

Holmes misled the entire Board because he knew that the Fairness Projections did not reflect management's true belief of the Company's value and prospects. Thereafter, the Board, relying on Defendant Holmes' and management's expertise, approved the materially false and misleading Fairness Projections. The Fairness Projections were then provided to bidders in the virtual data room, including Murata.  Bidders were not informed that "one case was more likely to be achieved than the other case."

42.   On January 3, 2022, Company A and Resonant amended their existing NDA, to expand the scope to cover a potential acquisition of Resonant and to include a 12-month standstill provision.

43.   On January 4, 2022, Centerview informed Murata's financial advisor, Mizuho Securities USA LLC ("Mizuho") that "it had spoken with several potential buyers on behalf of Resonant."  However, the Recommendation Statement does not indicate whether Centerview provided the other bidders with this same insight. Seemingly in response, the following day, Mizuho informed Centerview of Murata's desire for a greater level of engagement and acceleration of the sales process.

44.   On January 6, 2022, Resonant retained Proskauer Rose LLP ("Proskauer") as co-counsel to Stubbs Alderton in connection with the sales process.

45.   On January 7, 2022, in what appears to be a direct response to Murata's request for acceleration of the sales process, Centerview provided process letters to the three parties that executed NDAs (*i.e.*, Murata, Company A, and Company B), requesting that acquisition proposals be submitted to Resonant by January 25th.  The Company appeased Murata by accelerating the sales process, because the Individual Defendants wanted to sell the Company to Murata.

46.   On January 11, 2022, Company C was given publicly-available information in response to its diligence requests, but was informed by Resonant that it must execute an NDA before being granted access to additional information in the virtual data room.

CLASS ACTION COMPLAINT

47.    On January 12, 2022, *three months* after Murata submitted its first acquisition proposal, Murata and the Company finally executed an NDA in addition to the existing confidentiality obligations from the parties' commercial relationship. That same day, Murata was provided with full access to the Company's virtual data room. It is unclear why it took so long for the parties to execute an NDA applicable to the sales process.

48.    On January 14, 2022, the Board met with senior management and representatives of Stubbs Alderton to approve Resonant's 2022 annual operating plan, and to receive an update from Defendant Holmes regarding the sales process.

49.    On January 20, 2022, Company C expressed interest in receiving the additional diligence materials mentioned by Resonant, and provided Centerview with a proposed NDA. The following day, Centerview provided Company C with edits to the NDA, along with an additional agreement containing standstill provisions.

50.    On January 25, 2022, Murata submitted the same bid to acquire Resonant for $4.20 per share in cash, but did not request exclusivity.

51.    On January 28, 2022, the Board held a meeting with senior management, and with representatives of Stubbs Alderton, Proskauer, and Centerview present. During the meeting, it was noted that Company C and D were still interested in a transaction but had not yet executed NDAs. As Defendants knew, engaging with Company C and D would be a slow process given the confidentiality issues at stake. In the interim, Murata was able to move towards finalizing its acquisition, without competition.

52.    On January 30, 2022, the Board again met with senior management and representatives of Centerview, Stubbs Alderton, and Proskauer to discuss lessons from the sales process regarding "the commercialization of Resonant's technology and the viability of continuing as a stand-alone company."  Notably, this was discussed well-after the Fairness Projections were prepared and presented to the Board.

CLASS ACTION COMPLAINT

53.     Later that night, Murata communicated its best and final offer to acquire Resonant at $4.50 in cash per share, conditioned on a period of exclusivity. The Board decided to enter into exclusivity with Murata, instead of further engaging with Company C or D to solicit a higher acquisition proposal. This was because Murata was always the Defendants' preferred acquirer.

54.     On February 2, 2022, Murata and Resonant executed an exclusivity agreement, providing for a period of exclusivity through February 8th, which would automatically extend to February 15th, so long as Murata continued to negotiate in good-faith.

55.     Thereafter, the Board met on February 11, 2022, with senior management, Centerview, Stubbs Alderton, and Proskauer all present. Centerview informed the Board that on February 8th, Company C informed Centerview of its willingness to enter into a confidentiality agreement and standstill with Resonant. However, after discussions with Stubbs Alderton and Proskauer, Centerview decided not to respond due to the Company's exclusivity agreement with Murata.

56.     On February 14, 2022, the Board again met with senior management, Stubbs Alderton, Proskauer, and Centerview, and reviewed the terms of the proposed Merger Agreement.  In addition, Centerview reviewed its financial analyses that were based upon the unjustifiably low Fairness Projections that the Individual Defendants knew did not accurately reflect the Company's value and prospects. Utilizing those unreasonably low projections, Centerview deemed the inadequate Offer Price fair.  The Board then unanimously approved the Merger Agreement.

57.     Indeed, Defendants Holmes and McDermut deceived the Board about what they and the rest of management truly believed the value of Resonant was at the time.  The Individual Defendants allowed the Board to rely on a fairness opinion that was based upon the Fairness Projections that Defendants knew were materially false and misleading and did not reflect the Company's true value and financial prospects.

- 13 -

58.     In addition to obtaining a transaction with their preferred partner, through the Tender Offer, Defendant Holmes is set to receive over $3 million in Golden Parachute compensation, and Defendant McDermut is set to receive just under $1.5 million, as shown below:

**Golden Parachute Compensation**

| Name | Cash ($)[1] | Equity ($)[2] | Perquisites/ Benefits ($)[3] | Tax Reimbursement ($) | Other ($)[4] | Total Payout ($) |
|---|---|---|---|---|---|---|
| George B. Holmes | 1,062,500 | 1,939,955 | 50,151 | — | 5,000 | 3,057,606 |
| Martin S. McDermut | 733,918 | 644,549 | 40,859 | — | 5,000 | 1,424,326 |
| Dylan Kelly | 696,300 | 1,362,416 | 21,115 | — | 5,000 | 2,084,831 |

59.     Moreover, in addition to the financial benefits that came with the Tender Offer, Defendants Holmes and McDermut also received post-close employment with Murata.

**C.     The Fairness Projections Reflect Significantly Lower Revenue Figures Than Those Publicly Touted by Defendants**

60.     As mentioned above, on December 15, 2021, management presented the Fairness Projections to the Board. The Case One Projections were based on Murata remaining the Company's only significant technology development and licensing partner during the projections period. The Case Two Projections assumed that in addition to Murata, the Company would also have underline multiple other significant technology development and licensing partners during the projections period.[4]  Further, the Case Two Projections reflect the following differences to the Case One Projections:

- An increase in market share for the Company's filter designs; and

---

[4] Accounting for the fact that MMC's exclusive right to Resonant's XBAR® technology for filters or resonators for use in mobile communication devices would expire on March 31, 2022.

**CLASS ACTION COMPLAINT**

- An increase from 7% to 10% in the assumed royalty rate for the license of the Company's filter designs.

*Case One Projections*

| ($ in millions) | For Fiscal Year Ending December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2022E | 2023E | 2024E | 2025E | 2026E |
| Revenue | 7.8 | 14.6 | 24.0 | 35.1 | 48.7 |
| Operating income | (34.1) | (29.0) | (21.2) | (11.6) | 0.7 |
| Adjusted EBITDA[1] | (27.7) | (22.3) | (14.2) | (4.5) | 8.1 |
| Capital expenditures and other | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 |

*Case Two Projections*

| ($ in millions) | For Fiscal Year Ending December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2022E | 2023E | 2024E | 2025E | 2026E |
| Revenue | 7.8 | 18.2 | 35.7 | 60.2 | 96.6 |
| Operating income | (34.1) | (26.3) | (11.3) | 10.5 | 45.3 |
| Adjusted EBITDA[1] | (27.7) | (19.5) | (4.1) | 18.1 | 53.2 |
| Capital expenditures and other | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 |

61.    The Individual Defendants, and then the Board, approved the Fairness Projections for use by Centerview in rendering its fairness opinion in connection with the Tender Offer.

62.    However, neither set of projections—even the purported "upside case"—came close to reflecting Defendants' true belief as to the Company's value and prospects, as publicly touted by Defendant Holmes throughout the year leading up to creation of the Fairness Projections.  Indeed, during Resonant's final five earnings calls spanning from November 11, 2020, to November 10, 2021, *each of which Defendant McDermut attended*, Defendant Holmes consistently stated that Murata's partnership with Resonant <u>alone</u> had the ability to generate *over* **$100 million** in annual revenue for Resonant. The relevant excerpts of Defendant Holmes' statements from the last five earnings calls for Resonant are shown below:

Q3 2020 Earnings Call (November 11, 2020): "***I should also highlight that our initial XBAR customer has the market dominance to represent a market potential of over $100 million in annual revenue for Resonant. We're feeling really good about the progress and validation we're getting from the 5G market.*** The opportunities and non-mobile that we are engaged with for Wi-Fi and infrastructure applications are focused keenly on XBAR's ability to deliver the performance necessary at high frequency and wide bandwidth."

Q4 2020 Earnings Call (March 15, 2021): "***This partner alone could represent a potential of over a $100 million in annual revenue for Resonant. While that seems like a big step from where we are today, it becomes clear when observing our partner's position in the industry.*** The top seven filter manufacturer controlled over 90% of the market for filters and duplexers, our partner has the largest market share in both categories, controlling 37% of the filter market and 32% of the duplexer market. Their filter market share is bigger than the second and third largest players combined. Further, our partner has established relationships with some of the world's largest handset OEMs which allows us to leverage their expertise to bring XBAR into the market versus doing it ourselves."

Q1 2021 Earnings Call (May 12, 2021): "A few key facts are as follows: 98% of the market for filters and duplexers are controlled by the Top 7 filter manufacturers. Our partner has the largest market share in both categories, controlling 37% of the filter market and 32% of duplexer market. Their filter market share is bigger than the second and third largest filter players combined. Further, our partner has established relationships with some of the world's largest OEMs which allows us to leverage their expertise to bring XBAR into the market versus doing it ourselves. ***Given these market dynamics, this partner alone represents a potential of over $100 million of annual revenue for Resonant.***"

Q2 2021 Earnings Call (August 11, 2021): "They are also the largest filter supplier by a significant margin as evidenced by their filter market share being larger than the second and third largest players combined. ***By leveraging our partners' established relationships with the world's largest handset OEMs, we expect XBAR technologies to penetrate a large portion of the market. This partnership alone represents the potential for over $100 million in annual revenue for Resonant***."

CLASS ACTION COMPLAINT

<u>Q3 2021 Earnings Call (November 10, 2021)</u>[5]: "Our partnership was initiated after demonstrating XBAR's unique ability to dramatically improve RF filter performance for next generation wireless networks, while also accelerating their ability to deliver these high performance products to the market. This is a tremendous validation from the company that holds the leading market share position by a considerable margin. To be specific, they control about 36% of the filter market, and 33% of the duplexer market, which is more market share than the second and third largest players combined. ***If we continue to expand our agreement with this partner by adding additional design contracts, we believe this partnership could potentially increase to $100 million annual revenue opportunities for Resonant when 5G and Wi-Fi 6 reach the full scale deployments***."

63.   Indeed, the Case One Projections, representing the same scenario that Defendant Holmes describes in the earnings calls—where Murata is Resonant's only significant partner—does not come close to forecasting this $100 million revenue figure.  In fact, the highest annual revenue forecasted by the Case One Projections is $48.7 million in 2026, which is <u>*less than half*</u> of the $100 million figure repeatedly touted by Defendant Holmes.

64.   Worse, not even the "upside" Case Two Projections—that assumed the Company would have <u>multiple</u> significant technology development and licensing partners *in addition to Murata*—reached this $100 million revenue figure.  The highest revenue figure forecasted by the Case Two Projections was only $96.6 million in 2026.

65.   Accordingly, had the Fairness Projections reflected Defendants' true belief in the Company's value and prospects, as publicly touted throughout the year leading up to creation of the Fairness Projections, then the Fairness Projections would have been significantly higher.  Defendants knew that the Fairness Projections did not accurately portray the Company's value and prospects, but nevertheless caused the materially misleading projections and valuations derived from those projections to be

---

[5] This Earnings Call occurred <u>only</u> *one month prior* to management's presentation of the Fairness Projections to the Board.

CLASS ACTION COMPLAINT

disseminated to shareholders in order to solicit their approval of the unfair Tender Offer.

### D. The Defendants' Materially False and Misleading Statements in the Recommendation Statement

66. Defendants knowingly disseminated the materially false and misleading Recommendation Statement to solicit Resonant shareholders to tender their shares in connection with the Tender Offer. Defendants made materially false and misleading statements including: (i) the Fairness Projections; (ii) the valuation ranges Centerview derived from the misleadingly low Fairness Projections; and (iii) statements mischaracterizing the Fairness Projections as "reasonable" when Defendants knew they did not reasonably reflect their best estimate regarding the Company's value and prospects.

#### i. The Fairness Projections

67. The Recommendation Statement disseminated the materially false and misleading Fairness Projections with revenue forecasts that were significantly lower than management's genuine belief regarding the Company's prospects, as shown above. Throughout the year leading up to management's presentation of the Fairness Projections and as recent as one month prior (*i.e.*, Q3 2021 Earnings Call), Defendants publicly touted that Resonant's partnership with Murata *alone* could generate over **$100 million** in annual revenue for Resonant. Clearly, Defendant Holmes making the same specific statement with the same specific revenue figure in each of the Company's final five earnings calls indicates that this was what Defendants genuinely believed was Resonant's future revenue potential.

68. Thus, Defendants knowingly caused preparation of and/or approved the Fairness Projections that contained significantly lower revenue forecasts than what they genuinely believed the Company would generate. Indeed, in Defendant Holmes allowing the Board to approve the Fairness Projections—that he knew did not reflect

CLASS ACTION COMPLAINT

his or management's belief—for use by Centerview and for inclusion in the Recommendation Statement, he misled his own Board and Resonant shareholders. Moreover, Defendant McDermut, who as CFO was meaningfully involved in the preparation of the Fairness Projections, and who signed the Recommendation Statement, misled shareholders because he too knew that the Fairness Projections did not represent his or management's true belief as to Resonant's value and prospects.

69.    Defendants Holmes and McDermut caused the Fairness Projections to reflect numbers far below their genuine expectations for the Company's future financial performance.

70.    In sum, the Fairness Projections were materially false and misleading, and misled Resonant's shareholders with respect to the purported fairness of the Offer Price, the Company's future financial prospects, and the inherent value of their shares.

ii.   <u>The Valuation Ranges Derived by Centerview</u>

71.    As disclosed in the Recommendation Statement, Centerview relied upon the Fairness Projections in deriving its financial analyses for the Tender Offer. The financial analyses yielded valuation ranges for Resonant that served as a comparative tool to assess the fairness of the Offer Price.   However, given that the Fairness Projections themselves were materially false and misleading (as explained above), this made the valuation ranges derived by Centerview and disclosed in the Recommendation Statement materially false and misleading as well. Had the Fairness Projections reflected management's true belief regarding the Company's revenue forecasts and financial prospects, then the Fairness Projections would have been significantly higher, meaning that the valuation ranges would have been higher as well.

72.    Accordingly, the Company's valuation ranges were materially false and misleading, and misled Resonant's shareholders as to the purported fairness of the Offer Price and the actual value of their shares.

CLASS ACTION COMPLAINT

iii.  <u>Management's Assumptions Regarding the Derivation of the Fairness Projections</u>

73.  The Recommendation Statement states that "[i]n preparing the Case One Projections, management made certain assumptions that it believed to be reasonable at the time they were made."

74.  The Recommendation Statement also provides that "Centerview assumed, *at the Company's direction*, that the [Fairness Projections] were reasonably prepared on bases reflecting the best currently available estimates and judgments of the management of the Company as to the matters covered . . .."

75.  However, both of these statements were materially false and misleading to the Company's shareholders. Management, led by Defendants Holmes and McDermut, did not actually believe that the assumptions made in deriving the Fairness Projections were reasonable, nor that they reflected management's best available estimates and judgments.  In fact, during the Q3 2021 Earnings Call, *only a month prior* to management's presentation of the Fairness Projections to the Board, Defendant Holmes reiterated a statement that he had been consistently touting for an entire year – that Resonant's partnership with Murata <u>alone</u> could generate *over* **$100 million** in annual revenue for Resonant.  Had the Fairness Projections been in line with Defendant Holmes' public statements reflecting management's true belief, the Fairness Projections would have been significantly higher.

**E.**  **The Materially False and Misleading Recommendation Statement Caused Resonant's Shareholders Financial Harm**

76.  The Offer Price represents inadequate compensation for the Company's shareholders and does not reflect the fair value of their shares, especially when considering that the Fairness Projections represented downward-revisions to what management truly believed the Company was worth. Had the Fairness Projections reflected management's true belief touted by Defendant Holmes—that a partnership with Murata <u>alone</u> had the ability to generate **$100 million** in annual revenue for

- 20 -

CLASS ACTION COMPLAINT

Resonant—then the Fairness Projections would have been significantly higher, requiring a higher Offer Price to adequately compensate the Company's shareholders.

77. Moreover, Centerview's *Analyst Price Target Analysis* revealed that Wall Street research analyst price targets for the Company as of February 11, 2022, the last trading day prior to execution of the Merger Agreement, ranged from $5.00 to $6.25 per share. Thus, the Offer Price of $4.50 per share falls well-below this range, which further indicates that the Offer Price undervalued Resonant shares.

78. Accordingly, the Offer Price received by the Company's shareholders was unfair and inadequate, as the intrinsic value of their shares materially exceeded the Offer Price. Furthermore, the materially misleading Recommendation Statement was an essential link in the consummation of the unfair Tender Offer and the proximate cause of the resulting economic loss that shareholders suffered. Indeed, the materially false and misleading statements deceived shareholders as to the fair value of their shares and caused them to accept the unfair Offer Price.

## **CLASS ACTION ALLEGATIONS**

79. Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually, and on behalf of the other former public stockholders of Resonant who were harmed by Defendants' actions described herein (the "Class"). The Class specifically excludes Defendants herein, and any person, firm, trust, corporation or other entity related to, or affiliated with, any of the Defendants.

80. This action is properly maintainable as a class action because:

(a) The Class is so numerous that joinder of all members is impracticable. As of the Expiration Time, there were in excess of 63 million shares of Resonant common stock outstanding held by hundreds to thousands of individuals and entities nationwide;

(b)      There are questions of law and fact that are common to the Class and predominate over any questions affecting only individual Class members, including, among others:

                    (i)      Whether Defendants have violated Sections 14(e) and 20(a) of the Exchange Act in connection with the Tender Offer; and

                    (ii)      Whether Plaintiff and the other members of the Class suffered damages as a result of the actions of Defendants complained of herein.

(c)      Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

(d)      Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff has the same interests as the other members of the Class;

(e)      Prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

(f)      Defendants have acted, or refused to act, on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

(g)      A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

CLASS ACTION COMPLAINT

## FIRST CAUSE OF ACTION

### Claim for Violations of Section 14(e) of the Exchange Act Against
### All Defendants

81.     Plaintiff repeats and realleges each allegation contained above as if fully set forth herein.

82.     Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation." 15 U.S.C. § 78n(e).

83.     As discussed above, Resonant filed with the SEC and delivered the Recommendation Statement to its stockholders, which Defendants knew contained material misstatements, as set forth above.

84.     The Recommendation Statement was reviewed and disseminated by Defendants. Defendants knew that the Recommendation Statement contained the above-referenced materially false and misleading statements regarding the Fairness Projections and the valuation ranges derived from the Fairness Projections.

85.     Defendants made untrue statements of material facts, in violation of Section 14(e) of the Exchange Act.  By virtue of their positions within the Company and/or roles in the process and in the preparation of the Recommendation Statement, Defendants were aware the Recommendation Statement contained materially false and misleading statements, and knew of their obligation to disclose truthful information in the Recommendation Statement.

86.     The misleading and untrue statements in the Recommendation Statement are material in that a reasonable stockholder would consider them important in deciding whether to tender their shares or seek appraisal.

CLASS ACTION COMPLAINT

87.     As a proximate result of the above-referenced material misstatements, Plaintiff and the Class suffered significant damages. Indeed, the false and misleading statements deceived shareholders regarding the fair value of their shares and the Company's financial prospects and caused them to accept the unfair Offer Price.

88.     Accordingly, Defendants are liable for violating Section 14(e) of the Exchange Act, and Plaintiff and the Class are entitled to recover damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
**Claim for Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**

89.     Plaintiff repeats and realleges each allegation contained above as if fully set forth herein.

90.     The Individual Defendants acted as controlling persons of Resonant within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Resonant, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements contained in the Recommendation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

91.     Each of the Individual Defendants were provided with or had unlimited access to copies of the Recommendation Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

92.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed

- 24 -

CLASS ACTION COMPLAINT

to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same. The Recommendation Statement at issue contains the recommendation of Individual Defendant Holmes as a member of the Board and CEO, and of Individual Defendant McDermut as signatory of the Recommendation Statement in his capacity as CFO of Resonant. They were, thus, directly involved in the making of this document.

93. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

94. As set forth above, the Individual Defendants had the ability to exercise control over and did control Resonant, which violated Section 14(e) of the Exchange Act by the acts alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' conduct, Plaintiff and the Class suffered damages, in an amount to be determined at trial.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A. Declaring that this action is properly maintainable as a class action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B. Awarding Plaintiff and the Class damages sustained as result of the Defendants' wrongdoing, including but not limited to compensatory damages, rescissory damages, and quasi-appraisal damages, plus pre-judgment and post-judgment interest;

C. Awarding Plaintiff and the Class the costs and disbursements of this action, including reasonable attorneys' fees, experts' fees, and expenses;

D. Awarding extraordinary and/or equitable relief as permitted by law, equity, and the federal statutory provisions sued hereunder; and

CLASS ACTION COMPLAINT

1         E.     Granting such other and further equitable relief as this Court may deem

2    just and proper.

3    **<u>JURY DEMAND</u>**

4         Plaintiff demands a trial by jury.

6    DATED: May 19, 2022                  Respectfully Submitted,

7    **OF COUNSEL**                      **MONTEVERDE & ASSOCIATES PC**

8
9    **MONTEVERDE & ASSOCIATES PC**     */s/ David E. Bower*

Juan E. Monteverde                 David E. Bower, SBN 119546

10   The Empire State Building            600 Corporate Pointe, Suite 1170

350 Fifth Avenue, Suite 4405         Culver City, CA 90230

11   New York, NY 10118                 Tel: (310) 446-6652

Tel: (212) 971-1341                 Fax: (212) 202-7880

12   Fax: (212) 202-7880                 dbower@monteverdelaw.com

13   jmonteverde@monteverdelaw.com

14   *Attorneys for Plaintiff*              *Attorneys for Plaintiff*

CLASS ACTION COMPLAINT