JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

KEN CALLEN,

                    Plaintiff,

     v.

RESONANT, INC., *et al.*,

                   Defendants.

Case No. 2:22-cv-03403-FLA (ASx)

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT [DKT. 55] AND REQUEST FOR JUDICIAL NOTICE AND INCORPORATION BY REFERENCE [DKT. 56]**

## **RULING**

      Before the court is Defendants Resonant, Inc. ("Resonant"), George B. Holmes ("Holmes"), Martin S. McDermut ("McDermut"), Michael J. Fox, Ruben Caballero, Alan B. Howe, Jack H. Jacobs, Joshua Jacobs, Jean F. Rankin, Robert Tirva's (collectively, "Defendants") Motion to Dismiss ("Motion") Plaintiff Ken Callen's ("Plaintiff") Second Amended Complaint ("SAC"). Dkt. 55 ("Mot.").[1] Plaintiff opposes the Motion. Dkt. 57 ("Opp'n"). On July 15, 2024, the court found this matter appropriate for resolution without oral argument and vacated the hearing set for

---

[1] The court cites documents by the page numbers added by the CM/ECF system rather than any page numbers listed on the documents natively.

1

July 19, 2024.  Dkt. 62; *see also* Fed. R. Civ. P. 78(b); Local Rule 7-15.

For the reasons stated herein, the court GRANTS the Motion and DISMISSES the SAC with prejudice.

## **BACKGROUND**

For purposes of the subject Motion, the court assumes the following facts to be true.  *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159 (9th Cir. 2016).  Resonant is a technology development company that designs radio frequency filters for 5G mobile and other wireless devices on a software platform called WaveX, using a proprietary technology known as XBAR.  Dkt. 52 ("SAC") ¶ 2.  "Filters are electronic components incorporated into mobile and other wireless devices that let desired signals pass while blocking unwanted signals that can cause interference." *Id.* Resonant licenses its filter designs to manufacturers who pay royalties to Resonant at a fixed amount per filter, or as a percentage of the sales price of a filter incorporating Resonant's design.  *Id.* ¶ 3.  During the relevant period, Holmes served as Resonant's Chief Executive Officer and Chairman of its Board of Directors (the "Board"), McDermut served as Chief Financial Officer, and the remaining Defendants served as members of the Board.  *Id.* ¶¶ 64–72.

On July 31, 2019, Resonant formed a partnership with Murata Manufacturing Co., Ltd. ("Murata Japan"), the world's largest radio frequency filter manufacturer, whereby Resonant sold 3,960,560 shares to Murata Japan's subsidiary, Murata Electronics North America, Inc. ("Murata America"), at $2.53 per share, giving Murata America an 8.5% stake in Resonant.  SAC ¶¶ 5–6, 81–82.  On September 30, 2019, Resonant executed a collaboration and license agreement with Murata Japan (the "CLA"), whereby the two companies agreed to collaborate closely on the development of proprietary filter designs using Resonant's technology.  *Id.* ¶ 7.  "The CLA provided that Resonant would license certain filter designs to Murata Japan for four specific radio frequency bands in exchange for up to $9 million in royalties (i.e., up to $2.25 million per design or 'device')," which were to be paid as Resonant

achieved certain technological milestones with respect to designs. *Id.* ¶ 8. Murata
Japan was granted exclusive use of Resonant's XBAR technology for mobile devices
through March 31, 2022. *Id.* ¶ 9.

On September 20, 2021, Murata Japan expressed an interest in having Murata
America acquire Resonant. *Id.* ¶ 11. "[O]n September 30, 2021, Resonant and
Murata Japan executed an addendum to the CLA ('CLA Addendum'), covering
designs for up to four additional radio frequency bands, and providing for a $4.0
million non-refundable upfront payment, and up to an aggregate of between $8.0
million and $36.0 million in prepaid royalties (i.e., between $2 million and $9 million
per filter design, or 'device,' based on the complexity of the designs selected for
development)." *Id.* ¶ 12.

On October 12, 2021, Murata America submitted an initial bid to purchase
Resonant's outstanding shares at $4.00 per share in cash. *Id.* ¶ 16. The Board met the
following day and determined the proposal undervalued Resonant, even though the
stock price had closed at $2.29 per share that day. *Id.* ¶ 162. On November 9, 2021,
the Board retained non-party Centerview Partners LLC ("Centerview") to serve as its
financial advisor. *Id.* ¶¶ 19, 164. Centerview contacted multiple parties to solicit their
interest in pursuing a transaction with Resonant. *Id.* ¶ 164. Murata and four other
radio frequency filter industry participants expressed an interest in receiving
additional information about Resonant's technology and operations. *Id.* ¶ 166. After
Murata Japan and two of these additional companies signed non-disclosure
agreements, Resonant provided them with financial information, forecasts, product
and technology demonstrations, and other diligence materials through meetings with
Resonant's representatives, along with access to Resonant's virtual data room. *Id.*

On December 9, 2021, Murata America increased its bid to $4.20 per share in
cash. *Id.* ¶ 167. In January 2022, Resonant's management conducted meetings with
the two additional companies, at which time "Resonant['s] management reviewed
Resonant['s] operations, technology, markets, management team, engineering

3

capabilities, financial performance and synergies specific to each company, provided product and technology demonstrations and answered questions." *Id.* ¶ 170. Additionally, on January 11, 2022, Centerview provided a third company with publicly available information responsive to its preliminary due diligence requests and explained Resonant would provide more information following execution of a non-disclosure agreement. *Id.*

The four other companies that had expressed an interest declined to submit offers by January 25, 2022, and Murata America resubmitted its bid of $4.20 per share in cash that same date. *Id.* ¶ 171. On January 29, 2022, Centerview advised Murata America's financial advisor that the Board did not support a transaction at a price of $4.20 per share in cash, and asked Murata America to make a best and final offer. *Id.* ¶ 172. On January 30, 2022, Murata America submitted its last, best, and final offer of $4.50 per share in cash (the "Merger Consideration"). *Id.* ¶ 173.

On February 14, 2022, the Board held a meeting during which Centerview presented orally its opinion that Murata America's bid of $4.50 per share was fair to Resonant shareholders. *Id.* ¶ 181. Centerview issued a written fairness opinion (the "Fairness Opinion") later that day. Dkt. 55-14. The Fairness Opinion states Centerview reviewed and relied upon internal data and forecasts prepared and provided by Resonant's management, including two sets of Board-approved projections of Resonant's revenue potential for 2022–2026: the "Case One Projections" and the "Case Two Projections" (together, the "Case Projections"). SAC ¶¶ 34–36. Following Centerview's oral presentation of the Fairness Opinion, the Board approved the Merger unanimously, determined the Merger was in the best interests of Resonant and its stockholders, and resolved to recommend that Resonant stockholders tender their shares to Murata America pursuant to the tender offer proposed. *Id.* ¶ 182. On February 14, 2022, Resonant and Murata America executed the Merger Agreement and issued a joint press release announcing the forthcoming commencement of Murata America's tender offer to acquire all common shares of

Resonant for $4.50 per share in cash (the "Tender Offer"). *Id.* ¶¶ 1, 184.

On February 28, 2022, Murata America commenced the Tender Offer by filing a Tender Offer Statement (the "TO Statement") with the United States Securities and Exchange Commission ("SEC"). *Id.* ¶ 30. The TO Statement provided that the Tender Offer expired on March 26, 2022, at 12:00 a.m. Eastern Time (the "Tender Offer Expiration Date"), unless extended or terminated at an earlier time. *Id.* The TO Statement further provided that the Tender Offer would be consummated if the number of Resonant shares tendered validly as of the Tender Offer Expiration Date combined with the shares Murata America owned already represented a majority of the total number of Resonant shares outstanding (the "Threshold Percentage"), and certain other conditions were satisfied. *Id.* Upon consummation, Resonant would merge with an affiliate of Murata America under Delaware law, without a vote by Resonant stockholders, with all outstanding shares not tendered previously converted automatically into the right to receive the Merger Consideration. *Id.* Resonant would then continue as the surviving corporation and a wholly-owned subsidiary of Murata America. *Id.* That same day, the Board set forth its recommendation to tender in a recommendation statement (the "Recommendation Statement") filed with the SEC. *Id.* ¶ 1; Dkt. 55-13.

On March 28, 2022, Resonant announced that shares representing 75.57% of Resonant's outstanding shares had been tendered by the Tender Offer Expiration Date. SAC ¶ 187. As a result, the Merger was completed without the need for a stockholder vote. *Id.*

On May 19, 2022, former Plaintiff Joseph Boudre filed the Class Action Complaint ("Complaint") in this action, asserting two claims for violation of Sections 14(e) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act," 15 U.S.C. §§ 78n(e), 78t(a)), individually, and putatively on behalf of the other former public stockholders of Resonant. Dkt. 1. On August 5, 2022, the court appointed Ken Callen as Lead Plaintiff and dismissed Joseph Boudre without prejudice. Dkt. 20.

1    On September 9, 2022, Plaintiff filed a First Amended Complaint ("FAC"),

2    asserting the same two claims as in the Complaint.  On October 21, 2022, Defendants

3    filed a Motion to Dismiss the FAC (Dkt. 33), which the court granted with leave to

4    amend on December 27, 2023 (Dkt. 51, "Order Dismissing FAC").

5    On January 17, 2024, Plaintiff filed the operative SAC, asserting the same

6    claims as in the FAC, as well as an additional claim against all Defendants for

7    violations of Section 14(d) of the Exchange Act (15 U.S.C. § 78n(d)).  SAC.

8    Defendants filed the subject Motion on March 1, 2024.  Mot.

9    ## REQUEST FOR JUDICIAL NOTICE

10    Defendants request the court take judicial notice of and/or deem incorporated

11    by reference the following two categories of documents: (i) transcripts and

12    presentations from Resonant's quarterly earnings calls (*see* Dkts. 55-2 through 5-11);

13    and (ii) certain documents filed with the SEC, including Resonant's Merger

14    Agreement with Murata America, Resonant's Recommendation Statement, and

15    Murata America's Schedule TO Tender Offer Statement (Dkts. 55-12 through 55-15).

16    Dkt. 56 at 3–5.  Plaintiff does not oppose the request.

17    "[I]ncorporation-by-reference is a judicially created doctrine that treats certain

18    documents as though they are part of the complaint itself."  *Khoja v. Orexigen*

19    *Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018).  "The doctrine prevents

20    plaintiffs from selecting only portions of documents that support their claims, while

21    omitting portions of those very documents that weaken—or doom—their claims."  *Id*.

22    A document may be deemed incorporated by reference "if the plaintiff refers

23    extensively to the document or the document forms the basis of the plaintiff's claim."

24    *Id.* (quotation marks and citation omitted).  A document forms the basis of a claim

25    when it serves as the foundation for an element of the claim.  *Id.* at 1005.  "[I]f the

26    document merely creates a defense to the well-pled allegations in the complaint, then

27    that document [does] not necessarily form the basis of the complaint."  *Id.* at 1002.  A

28    court may generally assume an incorporated document's contents are true for purposes

of a motion to dismiss, unless such assumptions serve only to dispute facts stated in a well-pleaded complaint. *Id.* at 1003.

The exhibits in question are quoted and referenced extensively in the SAC, and form the basis of Plaintiff's claims. *E.g.*, SAC ¶¶ 4, 10, 13–15. The court, therefore, GRANTS Defendants' Request and DEEMS these exhibits (Dkts. 55-2 through 55-15) incorporated by reference into the SAC. *See Khoja*, 899 F.3d at 1002–03.

## **LEGAL STANDARD**

### I.    **Rule 12(b)(6)**

Under Fed. R. Civ. P. ("Rule") 12(b)(6), a party may file a motion to dismiss a complaint for "failure to state a claim upon which relief can be granted." The purpose of Rule 12(b)(6) is to enable defendants to challenge the legal sufficiency of the claims asserted in the complaint. *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987). A district court properly dismisses a claim under Rule 12(b)(6) if the complaint fails to allege sufficient facts "to state a cognizable legal theory or fails to allege sufficient factual support for its legal theories." *Caltex*, 824 F.3d at 1159.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter … to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations and brackets omitted).

"Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (citations and parentheticals omitted). "Determining whether a complaint states a plausible claim for relief is 'a context-specific task that

requires the reviewing court to draw on its judicial experience and common sense.'" *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679).

When evaluating a complaint under Rule 12(b)(6), the court "must accept all well-pleaded material facts as true and draw all reasonable inferences in favor of the plaintiff." *Caltex*, 824 F.3d at 1159. Legal conclusions "are not entitled to the assumption of truth" and "must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. The court need not accept as true allegations that contradict matters properly subject to judicial notice or established by exhibits attached to the complaint. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001), *amended on other grounds in* 275 F.3d 1187 (2001). "Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Id.*

A court must normally convert a Rule 12(b)(6) motion into a motion for summary judgment under Rule 56 if it considers evidence outside the pleadings. *United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir. 2003). "A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *Id.* at 908.

## II. Pleading Standards for Securities Fraud

A plaintiff alleging securities fraud must comply with the requirements of Rules 8(a) and 9(b), and the heightened pleading standards of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b). *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012); *see also Rubke v. Cap. Bancorp Ltd.*, 551 F.3d 1156, 1167 (9th Cir. 2009) (recognizing the PSLRA's falsity pleading requirement applies to claims under Section 14(e)); *In re Finjan Holdings, Inc. Sec. Litig.*, Case No. 3:20-cv-04289-EMC, 2021 WL 1391539, at *7 (N.D. Cal. Apr. 13, 2021) ("Even though a § 14(e) claim can be predicated on negligence, a § 14(e) claim

1   that is predicated on fraud should still be subject to Rule 9(b).") (emphasis omitted).

2       Under Rule 8(a), a pleading must contain a short and plain statement of the

3   claim showing that the pleader is entitled to relief.  Fed. R. Civ. P. 8(a)(2).  Under

4   Rule 9(b), a plaintiff alleging fraud must plead "the circumstances constituting fraud

5   or mistake … with particularity."  Fed. R. Civ. P. 9(b).  The heightened pleading

6   requirements of Rule 9(b) are designed "to give defendants notice of the particular

7   misconduct which is alleged to constitute the fraud charged so that they can defend

8   against the charge and not just deny that they have done anything wrong."

9   *Neubronner v. Milken*, 6 F.3d 666, 671–72 (9th Cir. 1993).  To provide this required

10  notice, "the complaint must specify such facts as the times, dates, places, and benefits

11  received, and other details of the alleged fraudulent activity."  *Id.* at 672.  Further, "a

12  pleader must identify the individual who made the alleged representation and the

13  content of the alleged representation."  *Glen Holly Ent., Inc. v. Tektronix, Inc.*, 100 F.

14  Supp. 2d 1086, 1094 (C.D. Cal. 1999).

15      "The PSLRA has exacting requirements for pleading 'falsity.'"  *Metzler Inv.*

16  *GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008).  To properly

17  allege falsity, a securities fraud complaint must "specify each statement alleged to

18  have been misleading, the reason or reasons why the statement is misleading, and, if

19  an allegation regarding the statement or omission is made on information and belief,

20  … state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-

21  4(b)(1); *Metzler*, 540 F.3d at 1070.  This particularity requirement "prevents a plaintiff

22  from skirting dismissal by filing a complaint laden with vague allegations of

23  deception unaccompanied by a particularized explanation stating why the defendant's

24  alleged statements or omissions are deceitful."  *Metzler*, 540 F.3d at 1061.

25      The SAC alleges Defendants made false and misleading statements to persuade

26  Resonant shareholders to tender their shares to Murata America.  *E.g.*, SAC ¶¶ 1, 20,

27  32, 39.  Defendants contend the heightened pleading requirements of Rule 9(b) apply

28  here because Plaintiff's claims sound in fraud.  Mot. at 14.  Plaintiff does not dispute

this argument and responds only that the SAC "plead[s] with particularity the who, what, when, where and how of the misconduct charged." Opp'n at 16 (citing SAC ¶¶ 190–212). The court, therefore, concludes the SAC "sounds in fraud" and must comply with Rule 9(b) and the pleading requirements of the PSLRA. *See Finjan*, 2021 WL 1391593, at \*7.

## **DISCUSSION**

**I.    Second Claim for Violation of Section 14(d)(4) of the Exchange Act**

Defendants move to dismiss the second claim on the grounds that Section 14(d)(4) does not create an implied right of action for private plaintiffs. Mot. at 15 (citing *Varjabedian v. Emulex Corp.*, 888 F.3d 399, 409 (9th Cir. 2018)). Plaintiff does not respond to this argument in his Opposition and appears to concede this point. *See* Opp'n.

The court, therefore, GRANTS the Motion and DISMISSES this claim without leave to amend.[2]

**II.    First Claim for Violation of Section 14(e) of the Exchange Act**

Section 14(e) provides in relevant part:

> It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.

---

[2] Furthermore, Plaintiff added this claim to the SAC without requesting or receiving leave from the court, as required. *See* Fed. R. Civ. P. 15(a)(2). "When a court gives leave to file an amended complaint for a limited purpose, as was done here, the addition of a new claim unrelated to that purpose is improper." *Stoyanof v. Crocodiles Not Waterlillies, LLC*, Case No. 2:11-cv-00384-HWG, 2012 WL 13024085, at \*5 (D. Ariz. Feb. 16, 2012). Under Rule 12(f), a court may strike a pleading or portion of a pleading that is "redundant, immaterial, impertinent, or scandalous." Fed. R. Civ. P 12(f). Plaintiff's § 14(d)(4) claim is deficient for this additional reason.

15 U.S.C. § 78n(e).

"To state a claim under Section 14(e), a plaintiff must allege that (1) the defendant made a false statement of material fact or misleadingly incomplete statement, (2) shareholders relied on the false or misleadingly incomplete statement in accepting or rejecting the tender offer, and (3) shareholders suffered an economic loss as a result of the acceptance or rejection of the tender offer." *In re Finjan Holdings, Inc. Sec. Litig.*, 58 F.4th 1048, 1055 (9th Cir. 2023).

Defendants argue Plaintiff's Section 14(e) claim fails because Plaintiff does not meet his burden to plead a false or misleading statement. Mot. at 8–9. Plaintiff responds that: (1) Defendants made false and/or misleading statements in the Recommendation Statement in connection with the projected cash flows listed in the Case Projections (the "Projected Cash Flows"); (2) Centerview's Fairness Opinion was false because it was based on the Projected Cash Flows; and (3) Defendants made false and/or misleading statements in connection with the Board's assessment of Resonant's prospects for achieving stockholder value exceeding the Merger Consideration ($4.50 per share). Opp'n at 7. The court will address each in turn.

### A.     Projected Cash Flows

First, Plaintiff contends the Projected Cash Flows were false because they forecast Resonant would achieve positive cash flows no earlier than 2025 or 2026, even though: (1) McDermut stated in prior earnings calls that Resonant expected to reach cash flow break even on a quarterly basis in 2022, and confirmed that the CLA Addendum would "absolutely" help Resonant reach cash flow break even in calendar year 2022; (2) Holmes forecast that Resonant would achieve cash flow break even once Resonant reached approximately $27 to $30 million in billings, which would have been achieved under the CLA with 12 concurrent devices at approximately $2.25 million per device, "but was substantially accelerated under the CLA Addendum"; and (3) the Case Projections forecast revenue of $35 million by 2024 or 2025, and billings precede revenue by 12 to 24 months under Resonant's prepaid royalty model, such

1  that Resonant should have recognized this revenue as "billings" at an earlier time.

2  Opp'n at 11–12, 16–19.

3       Second, Plaintiff contends the statement that "Centerview assumed, at the

4  Company's direction, that the Internal Data (including, without limitation, the [Case

5  Projections]) were reasonably prepared on bases reflecting the best currently available

6  estimates and judgments of the management of the company as to the matters covered

7  thereby" (the "Best Estimate Statement") is false because the Projected Cash Flows

8  were objectively and subjectively false and could not have represented the best

9  estimate and judgment of Resonant's management. *Id.* at 20 (referencing Dkt. 55-13

10  at 38).  Finally, Plaintiff contends Centerview's Fairness Opinion was false because

11  Centerview based its discounted cash flow analysis on the Projected Cash Flows,

12  which Plaintiff contends were false. *Id.* at 24–25.

13       Defendants argue the Projected Cash Flows and Best Estimate Statement are

14  protected under the bespeaks caution doctrine because they were accompanied by

15  cautionary language warning of risks specific to the projections.  Mot. at 20.  "The

16  bespeaks caution doctrine protects affirmative, forward-looking statements from

17  becoming the basis for a securities fraud claim when they are accompanied by

18  cautionary language or risk disclosure." *In re Infonet Servs. Corp. Sec. Litig.*, 310 F.

19  Supp. 2d 1080, 1088 (C.D. Cal. 2003) (citing *In re Worlds of Wonder Sec. Litig.*, 35

20  F.3d 1407, 1413 (9th Cir. 1994)).  "To put it another way, the 'bespeaks caution'

21  doctrine reflects the unremarkable proposition that statements must be analyzed in

22  context." *Worlds of Wonder*, 35 F.3d at 1414.  "The bespeaks caution doctrine

23  provides a mechanism by which a court can rule as a matter of law … that defendants'

24  forward-looking representations contained enough cautionary language or risk

25  disclosure to protect the defendant against claims of securities fraud." *Id.* at 1413

26  (citation and quotation marks omitted).

27       Both the safe harbor provision of the PSLRA (15 U.S.C. § 78u-5(c)) and the

28  bespeaks caution doctrine "establish limitations on the potential liability of companies

and individuals for forward looking statements." *In re Clorox Co. Sec. Litig.*, 238 F.
Supp. 2d 1139, 1142 (N.D. Cal. 2002). "These doctrines are intended to create
common-sense limitations on plaintiffs' ability to assert materiality and reliance in
securities fraud actions" and "prevent a plaintiff from bringing a fraud claim based on
a prediction when the circumstances under which that prediction was made ought to
have cautioned against reliance." *Id.* at 1142–43. "Because the doctrines relate to
materiality and reliance, not scienter, the state of mind of the speaker need not be
assessed in determining the doctrines' applicability." *Id.* at 1143.[3]

Here, the Case Projections were preceded by the following cautionary language
in the Recommendation Statement:

> The summary of the Projections set forth below is included solely to
> give the Company's stockholders access to the principal financial
> projections that were developed by the Company's management, and
> which were considered by the Board, and is not included in this
> Schedule 14D-9 in order to influence any stockholder of the Company
> to decide to tender Shares or for any other purpose, including whether
> or not to seek appraisal rights with respect to Shares.

> The Projections were not prepared with a view toward public
> disclosure, or with a view toward compliance with published
> guidelines of the SEC, the guidelines established by the American
> Institute of Certified Public Accountants for preparation and
> presentation of financial forecasts, or United States generally accepted
> accounting principles ("*GAAP*"). The Projections included non-
> GAAP financial measures under SEC rules, including the Company's
> adjusted earnings before interest expense, interest income, income
> taxes, depreciation and amortization ("*Adjusted EBITDA*") and (as
> described below) free cash flow. This information should not be
> considered in isolation or in lieu of the Company's operating and
> other financial information determined in accordance with GAAP. In
> addition, because non-GAAP financial measures are not determined
> consistently by all entities, the non-GAAP measures presented in the

---

[3] As both parties cite cases concerning the PSLRA safe harbor, 15 U.S.C. § 78u-5, in
discussing the bespokes caution doctrine, the court assumes for purposes of the
subject Motion that the same standards apply to both.

Projections may not be comparable to similarly titled measures of other companies.  Neither the Company's independent registered public accounting firm, nor any other independent accountants, have compiled, examined or performed any procedures with respect to the prospective financial information included below, or expressed any opinion or any other form of assurance on such information or its achievability.

The Projections reflect management's subjective judgment in many respects and, therefore, are susceptible to multiple interpretations and periodic revisions based on actual experience and business developments.  As such, the Projections constitute forward-looking information and are subject to risks and uncertainties that could cause the actual results to differ materially from projected results, including, but not limited to: the Company's identification of feasible new product initiatives, management of R&D efforts and the resulting successful development of new technologies; the acceptance by customers of the Company's technology; the Company's reliance on key suppliers; rapid technological change in the industries in which the Company operates; and competitive factors, including pricing pressures and the introduction by others of new technology with similar or better functionality than the Company's technologies; and the other factors described in "Item 1A. Risk Factors" in the Company's Annual Report on Form 10-K for the year ended December 31, 2020.  The financial projections cannot, therefore, be considered a guaranty of future operating results, and the projections should not be relied upon as such.

The inclusion of the selected financial projections should not be regarded as an indication that the Company or its advisors or other representatives then considered, or now considers, such selected financial projections to be necessarily predictive of actual future events, and this information should not be relied upon as such.  None of the Company, Murata, Purchaser, or any of their respective affiliates or representatives intends to, and each of them disclaims any obligation to, update, revise or correct the projections.

The selected financial projections should be evaluated, if at all, in conjunction with the historical financial statements and other information regarding the Company contained in the Company's public filings with the SEC.  The Projections may differ from publicized analyst estimates and forecasts and, in each instance, they do not take into account any circumstances or events occurring after

14

the date they were prepared, including the announcement of the Offer and the Merger.  Further, the selected financial projections do not take into account the effect of any failure of the Offer to be consummated and should not be viewed as accurate or continuing in that context. Stockholders are cautioned not to place undue, if any, reliance on the selected financial projections included in this Schedule 14D-9.

Each of the Projections, although presented with numerical specificity, necessarily reflects numerous variables, estimates and assumptions that are inherently uncertain.  Because the Projections cover multiple years, by their nature they will become subject to greater uncertainty with each successive year and are unlikely to anticipate each circumstance that will have an effect on the Company's business and its results of operations.

Dkt. 55-13 at 34–36 (italics in original).

Immediately after the Case Projections, the Recommendation Statement additionally states:

None of the Company or its affiliates, officers, directors, advisors or other representatives has made or makes any representation to any stockholder or other person regarding the ultimate performance of Resonant compared to the information contained in any of the Projections or that projected results will be achieved consistent with any of the Projections or at all.  The Company has made no representation to Murata or the Purchaser, in the Merger Agreement or otherwise, concerning any of the Projections.

**In light of the foregoing factors and the uncertainties inherent in each the Projections, stockholders are cautioned not to place undue, if any, reliance on the Projections.**

*Id.* at 37 (emphasis in original).

These warning statements contain more than sufficient cautionary language to invoke the protections of the bespeaks caution doctrine.  *See, e.g.*, *Pino v. Cardone Cap., LLC*, Case No. 2:20-cv-08499-JFW (KSx), 2021 WL 3502493, at *12 (C.D. Cal. Apr. 27, 2021) (finding statements regarding projected rate of return on investments to be forward-looking statements protected under the bespokes caution doctrine based on accompanying cautionary language), *rev'd in part on other grounds*, 55 F.4th 1253 (9th Cir. 2022).

The Best Estimate Statement is also protected under the bespokes caution doctrine, as it reflects, at most, Defendants' belief in or preference for protected statements. *See Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 387 (S.D.N.Y. 2020) ("Courts … have found that statements which merely endorse or state the speaker's belief in a certain future outlook satisfy the PSLRA forward-looking requirement."), *aff'd* 847 Fed. App'x 35 (2d Cir. 2021); *City of Hialeah Emps.' Ret. Sys. v. FEI Co.*, 289 F. Supp. 3d 1162, 1173 (D. Or. 2018) ("[A] defendant's statement of its belief in or preference for a given projection is itself a forward-looking statement that is protected.").

Similarly, as Plaintiff's challenge to Centerview's Fairness Opinion is based on his argument that the Projected Cash Flows and Best Estimate Statement were false or misleading, the Fairness Opinion is also protected by the bespeaks caution doctrine. *See Gray*, 454 F. Supp. 3d at 387 (recognizing fairness opinion was also protected by the PSLRA safe harbor because "the allegations turn on the reasonableness of the [challenged projections] and the judgment that those projections … best reflect management's judgment about the future performance of [the company]").[4]

Plaintiff contends the bespeaks caution doctrine is inapplicable because the doctrine does not apply when management is expressing a current belief in the accuracy of forecasts and the plaintiff alleges such belief is not genuine. Opp'n at 20–21 (citing *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017)). *Quality Systems* does not support Plaintiff's argument. There, the Ninth Circuit held that the non-forward-looking portions of "mixed statements" (which contained both forward-looking and non-forward-looking portions) were not protected by the safe

---

[4] As the court explained: "If those projections were reasonable, the Complaint seems to reflect [that] there would be no basis to challenge them. And, if the projections were not reasonable, the Complaint alleges [that] the Proxy contains a false or misleading statement. That is precisely the inquiry that the safe harbor puts off-limits to the courts." *Gray*, 454 F. Supp. 3d at 387.

harbor provision of the PSLRA. *Quality Systems*, 865 F.3d at 1141–42. The non-forward-looking statements at issue in that case concerned statements about the contemporaneous state of the company's sales pipeline—not management's belief in the forward-looking portions of the statements, and this case is inapposite to Plaintiff's argument. *Id.* at 1142–43.

While there does not appear to be a binding Ninth Circuit ruling on this issue, courts have rejected Plaintiff's interpretation of the safe harbor. *E.g.*, *City of Hialeah*, 289 F. Supp. 3d at 1173 ("To take the view that an expression of 'present belief' in a forward-looking statement is a 'present fact'—and therefore not itself a forward-looking statement—would work an end-run around the PSLRA's safe harbor provision. Expressing confidence or lack thereof in a given projection is not different from making a projection. Every statement of a future projection carries at least the implicit assertion that the speaker or writer of that statement believes it."); *Gray*, 454 F. Supp. 3d at 387 ("Courts … have found that statements which merely endorse or state the speaker's belief in a certain future outlook satisfy the PSLRA forward-looking requirement."); *Golub v. Gigamon Inc.*, 372 F. Supp. 3d 1033 (N.D. Cal. 2019) ("It strains logic to suggest that it is possible to make a forward looking statement that is not in at least some way based on a belief about the present state of things."). This court agrees that expressions of present belief in forward-looking statements are protected as future-looking statements under the bespeaks caution doctrine. Plaintiff's argument, thus, fails.

Plaintiff next argues the cautionary language was insufficient because the Recommendation Statement did not disclose that Holmes and McDermut had shared far more optimistic cash flow projections in earnings calls and an online interview. Opp'n at 21–22. According to Plaintiff, this constituted information outside the Recommendation Statement that Resonant shareholders were not charged with seeking that the Recommendation Statement was required to disclose, and, thus, "no cautionary language short of an outright admission that the non-forward-looking

statements were materially false … would have been adequate." *Id.* (quoting *Quality Systems*, 865 F.3d at 1148).  The court disagrees.

Because the statements at issue here were forward-looking statements, *Quality Systems* is inapposite.  Plaintiff does not cite any legal authority to establish that forward-looking projections do not fall within the scope of the bespeaks caution doctrine unless a company and its representatives identify all other, differing projections they may have previously made specifically.  Plaintiff's argument, thus, fails.

In sum, the court finds the portions of the Recommendation Statement challenged (including the Projected Cash Flows, the Case Projections, and the Best Estimate Statement) and Centerview's Fairness Opinion are protected by the bespeaks caution doctrine.

**B.     The Board's Assessment of Resonant's Prospects for Achieving Stockholder Value Exceeding the Merger Consideration**

According to Plaintiff:

> [T]he Recommendation Statement was false and misleading because the Board based its recommendation that Resonant shareholders tender their shares in part on an assessment of "factors" that the Board concluded would make it difficult for Resonant to increase shareholder value above $4.50 per share as a standalone company, including:
>
> - that Resonant's XBAR filters … remain unproven in the market;
> - that significant challenges remain in the development of Resonant's XBAR technology, which could affect the timing of its commercial deployment;
> - Resonant's need to collaborate with larger companies with established customers to commercialize its filter technologies;
> - the existence of competing products and technology offered by competing firms that have existing customer relationships and are substantially larger and better capitalized than Resonant; and
> - the risk of delay in new product revenue growth and/or margin due to unforeseen technical challenges with Resonant's technology

SAC ¶ 49.  According to Plaintiff, these five risk factors "were false and misleading

because they directly contradicted statements Defendants Holmes and McDermut

made on quarterly earnings calls before the Merger." *Id.* ¶ 50 (emphasis omitted).

Plaintiff mischaracterizes the portion of the Recommendation Statement quoted,

which states in relevant part:

> In evaluating the Merger Agreement and the Transactions, the Board
> consulted with Resonant's management and legal and financial
> advisors and, in reaching its unanimous determination to approve the
> Merger Agreement and recommend the Transactions to Resonant's
> stockholders, the Board relied upon and considered numerous factors,
> including the following, each of which is supportive of its
> determination and recommendation:  …
>
> - the Board's assessment of Resonant's prospects for substantially
>   increasing stockholder value as a standalone company above
>   $4.50 per Share, including its consideration of the following
>   factors:
>
>   - that Resonant's XBAR® filters have not been produced in
>     commercial quantities, and remain unproven in the market;
>
>   - that significant challenges remain in the development of
>     Resonant's XBAR® technology, which could affect the
>     timing of its commercial deployment;
>
>   - the risk of delay in the deployment of 5G, which could delay
>     the market's need for Resonant's XBAR® filters that target
>     the high bandwidth and high frequency requirements of 5G;
>
>   - Resonant's need to collaborate with larger companies with
>     established customers to commercialize its filter
>     technologies;
>
>   - the existence of competing products and technology offered
>     by competing firms that have existing customer relationships
>     and are substantially larger and better capitalized than
>     Resonant;
>
>   - the risk of delay or interruption in anticipated revenue
>     growth and/or margin from new customers, which could be
>     impacted by multiple factors, such as market timing,
>     technical problems, qualification delays and other factors
>     not directly controlled by Resonant;

- the risk of delay in new product revenue growth and/or margin due to un-foreseen technical challenges with Resonant's technology;

- the introduction of superior technology by competing firms, many of which are substantially larger and better capitalized than Resonant; and

- the Company's ongoing need to raise cash to fund operations, which would require issuing additional equity that may be dilutive to existing stockholders; ….

Dkt. 55-13 at 31–32.

Contrary to Plaintiff's conclusory characterization of this portion of the Recommendation Statement, the Recommendation Statement did not state that the Board concluded these nine sub-factors "would make it difficult for Resonant to increase shareholder value above $4.50 per share as a standalone company," but that the Board had assessed "Resonant's prospects for substantially increasing stockholder value as a standalone company above $4.50 per Share," based on these nine sub-factors, and determined its assessment supported the Board's determination and recommendation. *Id.* The relevant question, thus, is not whether the Board stated falsely that it believed any of the five sub-factors identified made it more difficult for Resonant to increase its shareholder value over $4.50 per share—but whether the Board's statement that its assessment supported its determination and recommendation was false or misleading.

The Board's statement regarding its assessment is a statement of opinion. "Because the Exchange Act regulates statements of 'material fact,' a statement of opinion will run afoul of the Act only in special circumstances." *Finjan*, 58 F.4th at 1055 (italics omitted). "The Supreme Court has identified three such special circumstances: subjective falsity, embedded statements of fact, and misleading omissions." *Id.* As Plaintiff attacks the truthfulness of Defendants' belief in the statement at issue, Plaintiff's challenge arises under a theory of subjective falsity. *See id.* at 1056 ("Subjective falsity attacks the basic factual assertion that underlies all

statements of opinion: the assertion that the author holds and believes the stated

opinion."). "[W]here a plaintiff relies on a theory of subjective falsity, the plaintiff

must allege both that the speaker did not hold the belief she professed and that the

belief is objectively untrue." *Id.* (quotation marks and citations omitted). "These are

known as the 'subjective falsity' and 'objective falsity' requirements, respectively."

*Id.*

Defendants contend the challenged portion of the Recommendation Statement

is insufficient to support a Section 14(e) claim because Plaintiff fails to plead

sufficient facts to establish subjective falsity. Mot. at 21–24. Plaintiff responds he

has pleaded sufficient facts to create a reasonable inference that Defendants did not

believe these five risk factors supported their recommendation that Resonant

shareholders tender their shares. Opp'n at 23. The court agrees with Defendants.

Plaintiff's factual allegations do not give rise to a reasonable inference that

Defendants could not have believed legitimately that the five sub-factors identified

each supported their recommendation regarding the Merger—let alone that they could

not have believed legitimately their assessment of Resonant's prospects supported

their recommendation. *See Finjan*, 58 F.4th at 1059–60 (affirming dismissal of

Section 14(e) claim for failure to plead facts sufficient to create a reasonable inference

that the company's management did not believe in the reasonableness of the sale price

per share).

For example, while Plaintiff contends Defendants could not have believed

legitimately that Resonant's XBAR filters had not been produced in commercial

quantities and remained unproven in the market, because Holmes previously stated,

*inter alia*, that: "(i) Resonant had been widely recognized 'as a breakthrough solution

for high-frequency 5G applications;' (ii) Murata Japan had publicly identified

Resonant's technology as 'one of the critical components for them on their roadmap

going to high frequency;' and (iii) Resonant's development work with Murata Japan

had validated XBAR for other filter manufacturers," SAC ¶ 50 (emphasis omitted),

these statements do not contradict or render implausible the challenged statement.  To the contrary, these statements appear to indicate that Resonant's XBAR filters had not been produced in commercial quantities when the statements were made, and, thus, "remained unproven in the market."  Plaintiff's arguments regarding the other four factors identified are similarly deficient.  *See id.* ¶¶ 51–53.

Accordingly, the court finds Plaintiff fails to plead sufficient facts to establish that the portion of the Recommendation Statement challenged is false or misleading.

### C.    Loss Causation

The PSLRA states in relevant part: "Loss Causation.  In any private action arising under [the Exchange Act], the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate [the Exchange Act] caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4(b)(4).  "To show loss causation, a plaintiff must prove both economic loss and proximate causation."  *N.Y.C. Emps.' Ret. Sys. v. Jobs*, 593 F.3d 1018, 1023 (9th Cir. 2010) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005)), *overruled on other grounds by Lacey v. Maricopa County*, 693 F.3d 896, 925–27 (9th Cir. 2012).  "Rule 9(b) applies to all elements of a securities fraud action, including loss causation."  *Or. Pub. Emps. Ret. Fund v. Apollo Grp.*, 774 F.3d 598, 605 (9th Cir. 2014).

With respect to loss causation, the SAC alleges in relevant part:

> 218. Defendants' false and misleading statements in the Recommendation Statement deprived Resonant shareholders of the ability to fairly and reasonably evaluate the Tender Offer when deciding whether or not to tender their shares, thereby causing: (i) the consummation of the Merger at an unfair and inadequate price per share well below the value per share that Resonant could achieve as a standalone company, and (ii) economic harm to Resonant shareholders who either tendered or were forced to sell their shares to Murata America at the unfair and inadequate price.

> 219. Had Resonant shareholders not been misled by the false and misleading statements in the Recommendation Statement listed above, they would not have tendered their shares in sufficient numbers for

22

1
2
3

> Murata America to realize the Threshold Percentage, and therefore the Merger could not have been consummated at an unfair and inadequate price. Instead, Murata America would have been forced to raise its bid to acquire Resonant, and would undoubtedly have done so….

4   SAC ¶¶ 218–19.

5       Defendants argue Plaintiff fails to plead loss causation with the particularity

6   required to state a Section 14(e) claim. Mot. at 26. According to Defendants, Plaintiff

7   does not allege facts that demonstrate plausibly that Resonant could have capitalized

8   on a transaction more lucrative than the Merger, and relies instead on analysts'

9   estimates of Resonant's target share price to argue that the Merger Consideration was

10  insufficient. Mot. at 26. Defendants note the Ninth Circuit rejected a similar theory

11  based on analysts' price targets in *In re Ocera Therapeutics, Inc. Sec. Litig.*, 806 Fed.

12  App'x 603, 605 (9th Cir. 2020), as "too speculative to plead with particularity that

13  shareholders experienced losses." Mot. at 26–27.

14      Plaintiff responds "[t]he SAC adequately alleges loss causation because—as a

15  direct result of numerous false statements—Resonant shareholders tendered their

16  shares for less than fair value to Murata," when they could have chosen instead to

17  remain a standalone entity. Opp'n at 26. According to Plaintiff, "[t]he SAC

18  adequately alleges that Resonant had strong prospects for achieving value above the

19  Offer Price on a standalone basis." *Id.* at 26–27. Plaintiff further argues that Murata

20  had access to substantial, material, non-public information concerning Resonant's

21  technology as Resonant's development partner, that gave Murata unique insight into

22  the value of the technology unavailable to potential buyers and public stockholders

23  and allowed it to offer an unfairly low price in the Tender Offer. *Id.* at 27. Plaintiff's

24  assertions are entirely speculative and not supported plausibly by any facts pleaded.

25      Plaintiff acknowledges Centerview contacted multiple parties to solicit their

26  interest in pursuing a transaction with Resonant and shared information about

27  Resonant's technology and operations with four companies aside from Murata. SAC

28  ¶ 166. After Murata and two other companies signed nondisclosure agreements,

Resonant shared additional "financial information, forecasts, product and technology demonstrations, and other diligence materials through meetings with representatives of Resonant and by providing them access to Resonant's virtual data room." *Id.* In January 2022, Resonant's management conducted meetings with these two companies in which "Resonant['s] management reviewed Resonant operations, technology, markets, management team, engineering capabilities, financial performance and synergies specific to each company, provided product and technology demonstrations and answered questions." *Id.* ¶ 170. Despite this, Murata America was the only company that submitted a bid offer (of $4.20 per share in cash, as of January 25, 2022). *Id.* ¶ 171. Murata America's subsequent "last, best and final offer" of $4.50 in cash per share "represented a premium of approximately 249% to Resonant's closing price and 198% to Resonant's 20-day volume weighted price as of January 28, 2022." Dkt. 55-13 at 28.

These facts are sufficient to establish Plaintiff's belief that the shareholders could have obtained a higher offer than the Merger Consideration of $4.50 per share is speculative and not plausible. Plaintiff's contention that Murata had "substantial material nonpublic information concerning Resonant's technology" beyond what was provided to these two companies and "unique insight" that allowed it to offer an inadequate bid, likewise, is entirely speculative and not supported by any facts pleaded. Similarly, Plaintiff's belief that the actual value of Resonant's share price as a standalone entity was higher than the Merger Consideration is too speculative for Plaintiff to plead that shareholders experienced losses—let alone any losses related causally to conduct by Defendants. *See Ocera Therapeutics*, 806 Fed. App'x at 604–05 (affirming dismissal based on loss causation in analogous circumstances).

The court, therefore, finds Plaintiff fails to plead loss causation adequately.

**D.     Conclusion Regarding Plaintiff's First Claim**

For the reasons set forth above, the court GRANTS the Motion and DISMISSES Plaintiff's Section 14(e) claim for failure to plead with particularity: (1)

Defendants made a false statement of material fact or misleadingly incomplete statement in violation of the PSLRA; and (2) loss causation.

**III.    Third Claim for Violation of Section 20(a)**

"To establish a cause of action under [Section 20(a)], a plaintiff must first prove a primary violation of underlying federal securities laws, … and then show that the defendant exercised actual power over the primary violator." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014); *see also Varjabedian v. Emulex Corp.*, 888 F.3d 399, 409 (9th Cir. 2018) ("[C]laims under Section 20(a) of the Exchange Act necessarily depend on Plaintiff's Section 14(d)(4) and (e) claims.").

Having dismissed Plaintiff's Section 14(d)(4) and (e) claims for the reasons stated, the court also DISMISSES Plaintiff's third claim for violation of Section 20(a).

**CONCLUSION**

For the foregoing reasons, the court GRANTS Defendants' Motion and DISMISSES the SAC in its entirety.  As Plaintiff did not request leave to amend and further amendment would be futile, this dismissal is with prejudice.  Having granted the Motion for the reasons stated, the court need not address the parties' remaining arguments.


IT IS SO ORDERED.


Dated: March 28, 2025

FERNANDO L. AENLLE-ROCHA
United States District Judge